# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs November 20, 2013

## STATE OF TENNESSEE v. BRIAN ROBERSON

**Appeal from the Criminal Court for Johnson County**
**No. 5065      Robert E. Cupp, Judge**

---

**No. E2013-00376-CCA-R3-CD-FILED-MARCH 14, 2014**

---

The Defendant, Brian Roberson, appeals from his jury conviction for facilitation of first-degree premeditated murder. Specifically, he contends (1) that the evidence presented at trial was insufficient to support his conviction; (2) that the trial court erred in allowing, over the objection of defense counsel, a witness's preliminary hearing testimony to be admitted as substantive evidence at trial under the former testimony exception to the hearsay rule; and (3) that consecutive sentencing was improperly imposed. After reviewing the record and the applicable authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

H. Randolph Fallin, Mountain City, Tennessee, for the appellant, Brian Roberson.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Tony Clark, District Attorney General; Dennis Brooks and Matthew Roark, Assistant District Attorneys General; for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

This case arises out of the September 1, 2006 murder of Roshad Siler (victim). The Defendant and his co-defendant, Morris Marsh, were indicted on April 3, 2007, for the first degree premeditated murder of the victim. A joint preliminary hearing was held on March 19, 2008, and the following evidence, as relevant to this appeal, was presented.

Steve Hannah, an inmate housed with the defendants in Unit 12 at Northeast

Correctional Complex (NCC), testified that he witnessed a verbal altercation between co-defendant Marsh and the victim during a basketball game they were playing on September 1, 2006. According to Hannah, they resumed playing, but after they came inside, the defendants approached the victim and told him, "he'd better apologize, or they said if not, you know, there was going to be trouble. And he said, he told them, f--k theirselves [sic]. And, so, they walked off." Later, Hannah saw the defendants coming down the steps, and Sean[1] joined up with them. Co-defendant Marsh "went off to the side. And the [Defendant and Sean] started confronting [the victim]." The men began fighting, and the Defendant was "throwing punches at [the victim]"; there appeared to be a weapon in the Defendant's hand. "[The victim] was trying to back off and get away from them, but they w[ere] fighting him[.]" The Defendant and Sean backed the victim "all the way down to the corner of the cell underneath the stairs, and . . . he fell." That was when co-defendant Marsh "c[a]me from around the phones, and . . . he stuck [the victim] in the side of the neck, somewhere in the upper area." Hannah testified that they were still hitting the victim a little, but he was somehow able to get up. All three men chased the victim until he fell again, and that was when the men "took off and went the other way. And that's when the officers in the unit started yelling for everybody to lock down." Hannah identified the weapon that co-defendant Marsh used to stab the victim.

On cross-examination, Hannah admitted that he never saw anything in the Defendant's hand during the altercation but assumed that the Defendant had a weapon because of "the way [the Defendant's] hand was being held." Hannah further admitted that the Defendant never threatened the victim in his presence.

A joint trial was conducted on December 12-14, 2011, and the following evidence, as relevant to this appeal, was presented to the jury. Jonathan Franklin, a correctional officer at NCC, testified that he was at work, supervising inmates, on September 1, 2006, when the incident involving the defendants and the victim occurred. He then testified that he saw co-defendant Marsh, Sean, and an unidentified inmate standing in a "box" formation, and the victim was running backwards. Officer Franklin explained that he could not identify one of the inmates because that inmate's back was to him during the altercation but that he did note the approximate height and weight of the inmate; he later determined that the unidentified inmate was the Defendant, using the process of elimination. Officer Franklin testified that co-defendant Marsh was swinging both hands wildly at the victim, and the Defendant and

---

[1]The inmate on trial with the defendants for his participation in the events was acquitted as there was conflicting testimony on the actual identity of the participating inmate, so to protect his privacy, we will not use his name in this opinion. Although the record suggests that the participating inmate's first name is Sean, it is unclear which inmate named Sean was involved. Therefore, we will simply refer to the participating inmate as "Sean" throughout the opinion.

Sean had their hands out to their sides the entire time during the incident. Officer Franklin realized that the victim was hurt after he fell backwards towards the officer's cage; there was a lot of blood, and the victim was bleeding from the neck. When asked if he ever saw the Defendant try to pull Marsh away from the victim, Officer Franklin testified that he never saw the Defendant make any hostile movements either way.

On cross-examination, Officer Franklin testified that the Defendant and co-defendant Marsh were roommates. He admitted that he never heard any communication between the defendants to indicate that they were acting in concert. He also admitted that, in his statement, he never said that the Defendant was involved in the incident; it was later when he narrowed down the identity of the unknown man.

William West, an inmate at NCC, testified that he had been incarcerated in the Department of Corrections (DOC) for eighteen years for especially aggravated robbery. West further testified that, from a second floor railing looking down on the day room in Unit 12, he witnessed the September 1, 2006 altercation between the victim and the defendants that ultimately led to the victim's death. According to West, co-defendant Marsh asked the victim to apologize for something that happened on the basketball court; the victim refused and essentially told Marsh to "do what he had to do." Co-defendant Marsh and the Defendant then went towards their cell; he could not see whether they actually went into their cell. When co-defendant Marsh and the Defendant returned from the area near their cell, they met with another inmate. "[The Defendant] went to the right. [Marsh] went to the left. [Sean] went directly through the middle of the [unit]. . . . and [punched] the victim." Then, the Defendant "stuck" the victim on the left side of his chest area, and Marsh stabbed the victim on the right side of his neck. West explained that the three men trapped the victim behind a pole. The victim walked underneath a nearby walkway, and West lost sight of him until he came out on the other side of the walkway and collapsed. Then, the Defendant and Marsh "c[a]me up the steps with knives in their hands and walked straight across the top of the walk[.]" West explained that the knives were "good sized[,]" and one was approximately ten to twelve inches long, skinny, made of steel, shaped to a point at both ends, about an inch wide, and wrapped with tape or cloth. Marsh then took both knives, wrapped them in his shirt, and dropped them in the trash can.

On cross-examination, West testified that he gave a statement after the incident but refused to sign it for his own protection; he only spoke with authorities again shortly before trial. West admitted that he had smoked a lot of marijuana, regularly, both in and out of prison and that it had affected his memory. West also admitted that he wrote the Defendant multiple times and that he even wrote the Defendant's attorney one time, which contained statements that contradicted his trial testimony; he claimed the letters were all lies and were written to ensure his safety.

-3-

Doctor Teresa Campbell, qualified as an expert in forensic pathology, testified that she conducted the autopsy on the victim. She further testified that the victim's cause of death was multiple stab wounds. Dr. Campbell explained that the victim had four separate stab wounds: one on the right side of the neck, hitting the carotid artery; a second in the right chest area, perforating the right lung and the aorta; a third on the top of the right shoulder, into the muscle; and the last in the upper, right arm, into the fat. She further explained that the first two wounds would have been the most immediately fatal. Dr. Campbell testified that she examined both of the prison knives admitted at trial and that, under the right circumstances, either of the knives could have inflicted the victim's wounds, but she could not say for certain that the knives caused the victim's injuries.

Captain Randy Lee, a shift commander at NCC, testified that he was working on September 1, 2006, when the victim was killed and that he arrived on the scene just after the incident occurred. He further testified that, sometime thereafter, he went to co-defendant Marsh's cell. Capt. Lee asked Marsh if he knew that the victim was dead, to which Marsh responded, "[Y]eah, I know he's dead I meant to kill him." Capt. Lee also testified that, later, Officer Cain brought him two shanks[2] found during a search of that unit; he placed them in a bag and then into a secure evidence locker.

Jeff Cain, an officer at NCC, testified that, during the search of the unit where the victim's murder occurred, he searched a trash can and found two shanks and gloves, a pair of shorts, and a shirt. One of the shanks had blood all over it. Officer Cain turned these items in to the shift captain, Capt. Lee.

Jerry Gentry, a compliance manager at NCC, testified that he assisted in the investigation of the victim's death. He further testified that all of the inmates involved in the altercation lived in Unit 12, where the death occurred. Mr. Gentry also testified that the Defendant and co-defendant Marsh lived in the same cell and that the Defendant wore a size ten and a half shoe.

Steve Hannah was called as a witness, but he refused to testify at trial. The court held him in contempt of court and imposed an additional ten-day sentence, but Hannah still refused to testify, claiming that he wanted to retract his previous statements, that he was forced to come to court, and that his safety was not being taken into consideration. The trial court ruled that he was "unavailable" and that his preliminary hearing testimony was admissible under the former testimony exception. Agent Franklin C. McCauley, Jr., a special agent criminal investigator with the Tennessee Bureau of Investigation (TBI), then read

---

[2] These are prison-made knives.

Hannah's testimony into evidence.

Agent McCauley testified that he was called to NCC to investigate the stabbing death of the victim. Upon arrival, he took photographic evidence of the scene and supervised, photographed, and videoed the bagging of evidence. The Defendant and co-defendant Marsh's cell was searched, and shoes retrieved from the cell matched both mens' sizes: the Defendant, size ten and a half, and Marsh, size twelve. The Defendant's shoes appeared to have blood on the toes of the shoes. Agent McCauley testified that he interviewed co-defendant Marsh, who relayed that he and the victim had a verbal altercation on the basketball court earlier that day and that the victim had disrespected him. Marsh stated that he approached the victim later to get him to "take back what he said[,]" but the victim refused; so, he went to his cell, retrieved his shank, and concealed it in his pocket. According to Marsh, when he returned to the community area, he confronted the victim, who also had a shank; Marsh managed to take the victim's shank and then attacked the victim with both shanks. Marsh claimed that the Defendant tried to stop him during the altercation. According to Agent McCauley, Marsh surmised that the Defendant might have gotten blood on his shoes because he stayed close to Marsh during the incident to make sure no one jumped on Marsh's back. Marsh also claimed that the Defendant did not know what he was going to do.

Agent Brad Everett, a TBI analyst in the Serelogy and DNA unit, was qualified as an expert in serelogy. He testified that one of the size ten and a half shoes, identified earlier as belonging to the Defendant, had blood spots on it. These blood spots tested positive for containing the victim's DNA.

The jury found the Defendant guilty of the lesser-included offense of facilitation of first degree premeditated murder, and a sentencing hearing was scheduled. At the sentencing hearing, the trial court found that the Defendant was a Range I, standard offender, and sentenced him to serve fifteen years in the DOC, consecutively to any unexpired sentences. The Defendant filed a timely motion for new trial, which was subsequently denied.

## ANALYSIS

In this appeal, the Defendant contends (1) that the evidence presented at trial was insufficient to prove that he had any knowledge that co-defendant Marsh intended to kill the victim; (2) that the trial court erred in allowing, over the objection of defense counsel, Hannah's preliminary hearing testimony to be admitted as substantive evidence at trial under the former testimony exception to the hearsay rule because the motive for cross-examining Hannah at the preliminary hearing was different from the motive for cross-examination at

trial; and (3) that consecutive sentencing was improperly imposed because none of the mandatory or permissive factors to consider when imposing consecutive sentencing applied in the Defendant's case. The State responds as follows: (1) that there was sufficient evidence for reasonable jurors to conclude that, based upon the Defendant's actions, he was aware of co-defendant Marsh's intent to kill the victim and that he substantially assisted co-defendant Marsh in that endeavor; (2) that the Defendant had an opportunity and similar motive to cross-examine Hannah at the preliminary hearing, as the ultimate goal in both proceedings was to prove his innocence; and (3) that consecutive sentencing was properly imposed based upon the trial court's finding that the Defendant had an extensive criminal history, which was supported by the record.

*I. Sufficiency of the Evidence*

The Defendant contends that the evidence presented at trial was insufficient to prove that he had any knowledge that co-defendant Marsh intended to kill the victim; further, he asserts that there was evidence that the Defendant attempted to stop the killing. The State responds that there was sufficient evidence for reasonable jurors to conclude that, based upon the Defendant's actions, he was aware of co-defendant Marsh's intent to kill the victim and that he substantially assisted co-defendant Marsh in doing so. We agree with the State.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Id. (quoting State

v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As a lesser-included offense of first degree premeditated murder, the jury convicted the Defendant of facilitation of first degree premeditated murder. Tennessee Code Annotated section 39-13-202(a)(1) defines premeditated first degree murder as "[a] premeditated and intentional killing of another." A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Id. at § 39-13-202(d). "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, . . . the person knowingly furnishes substantial assistance in the commission of the felony." Id. at § 39-11-403(a). Under this statute, a defendant who has been "charged as a party may be found guilty of facilitation as a lesser included offense if the defendant's degree of complicity is insufficient to warrant conviction as a party." Id. at Sentencing Comm'n Cmts.

The record reflects that the Defendant and co-defendant Marsh were cellmates. After a basketball game, they approached the victim in the community area of their unit regarding an incident between the victim and Marsh that had occurred during that game. During their conversation, Marsh threatened the victim after the victim refused to apologize to Marsh for what Marsh perceived as disrespect. A short time later, the Defendant and Marsh were observed coming back to the community area from the direction of their shared cell, where Marsh admittedly retrieved a shank and concealed it on his person. Once back in the community area, the Defendant and Marsh split up. Then, the Defendant and Sean approached the victim; Sean punched the victim, and the three men began fist fighting. During the fight, Marsh approached the victim and stabbed him several times with a shank. As the victim attempted to flee, the Defendant, Sean, and Marsh continued to advance on him in a "box" formation until the victim ultimately collapsed from his injuries. Later, when the police asked Marsh if he was aware that the victim had died from his injuries, Marsh responded, "[Y]eah, I know he's dead I meant to kill him." Viewing the evidence in a light most favorable to the State, a rational jury could have reasonably concluded that the Defendant knew of co-defendant Marsh's intent to kill the victim and, identical intent

notwithstanding, facilitated Marsh's endeavor by engaging in a physical fight with the victim, thus, distracting the victim. Further, it was also reasonable for the jury to believe that the Defendant's role in his and his cohorts' collectively surrounding the victim in a "box" formation, effectively preventing the victim from fleeing Marsh or seeking aid, provided Marsh with the substantial assistance needed to commit murder. We also note that there was no evidence that the Defendant attempted to aid the victim in any way. Although there was evidence presented that Marsh told Agent McCauley that the Defendant tried to stop him during the altercation, the jury, in its province as finder of fact, was free to disbelieve that assertion and clearly did so. Therefore, the Defendant is not entitled to relief on this issue.

## II. Hearsay: Admission of Hannah's Preliminary Hearing Testimony

The Defendant contends that the trial court erred in allowing, over the objection of defense counsel, Hannah's preliminary hearing testimony to be admitted as substantive evidence at trial under the former testimony exception to the hearsay rule. He explains that his motive for cross-examining Hannah at the preliminary hearing, discovery, was different from the motive for cross-examination at trial, establishing the Defendant's innocence. Thus, the Defendant contends that the testimony failed to meet the requirements for the former testimony exception and that the trial court's ruling denied him his Sixth Amendment right to confrontation. The State responds that the Defendant had an opportunity and similar motive to cross-examine Hannah at the preliminary hearing, because the ultimate goal in both proceedings was to prove his innocence. We agree with the State.

Generally, the admissibility of evidence rests within the sound discretion of the trial court, and this court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record. State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010). "A trial court abuses its discretion only when it applies an incorrect legal standard or makes a ruling that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Id. However, the determination of "[w]hether the admission of hearsay[3] statements violated

---

[3] See generally State v. Flood, 219 S.W.3d 307, 313 (Tenn. 2007)(quoting State v. Stout, 46 S.W.3d 689, 697 (Tenn. 2001), superseded by statute on other grounds, Tenn. Code Ann. § 39-13-204(c), as recognized in State v. Odom, 137 S.W.3d 572, 580-81 (Tenn. 2004)) (analyzing hearsay under an abuse of discretion standard). But see State v. Gilley, 297 S.W.3d 739, 759-60 (Tenn. Crim. App. 2008)("The precedential history for utilizing the abuse of discretion standard for hearsay issues, however, is somewhat checkered; in some of the notable cases relied upon as precedent, the court did not apply the standard to the review of hearsay issues. . . . [I]n State v. Maclin, 183 S.W.3d 335 (Tenn. 2006), [our supreme court] adverted to the general rule of abuse of discretion review of evidentiary questions before commenting that '[h]owever, the issue of whether the admission of hearsay statements violated a defendant's rights under the Confrontation Clause is purely a question of law.' Additionally, panels of the intermediate appellate courts have applied

(continued...)

a defendant's confrontation rights is ... a pure question of law." <u>Franklin</u>, 308 S.W.3d at 809. Thus, the proper application of that law to the trial court's factual findings is a question of law and is subject to de novo review. <u>Id.</u>

Tennessee Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 802 provides that hearsay is not admissible except as allowed by the rules of evidence or other applicable law. Tenn. R. Evid. 802. Rules 803 and 804 list the exceptions to this general rule of inadmissibility. One such exception is for former testimony. <u>Id.</u> at 804(b)(1). It provides as follows:

> The following [is] not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> (1) Former Testimony. Testimony given as a witness at another hearing of the same or a different proceeding or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination.

<u>Id.</u> As relevant to this appeal, the requirements for unavailability are met when a witness "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so." <u>Id.</u> at 804(a)(2). "A preliminary hearing transcript is precisely the type of former testimony contemplated under [Rule 804(b)(1)]." <u>State v. Bowman</u>, 327 S.W.3d 69, 88-89 (Tenn. Crim. App. 2009) (concluding that the witness's preliminary testimony was "admissible under the 'former testimony' hearsay exception of Rule 804(b)(1) and . . . did not violate the defendant's rights under the Confrontation Clause") (internal quotations omitted).

The Sixth Amendment of the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. The Tennessee Constitution provides the corresponding right "to meet witnesses face to face." Tenn. Const. art. I, § 9. In order to protect a defendant's right to confrontation, before the prior testimony of a witness will be admitted, the State must show that (1) the witness is unavailable and (2) the defendant had a prior opportunity to cross-examine the witness. <u>See</u> <u>State v. Maclin</u>, 183 S.W.3d 335, 351 (Tenn. 2006) (citing <u>Crawford v. Washington</u>, 541 U.S. 36, 68 (2004)).

---

[3](...continued)
a de novo standard to the review of hearsay issues [and permission to appeal these decisions was denied].")

A panel of this court in State v. Michael James Grubb, No. E2005-01555-CCA-R3-CD, 2006 WL 1005136 (Tenn. Crim. App. Apr. 18, 2006), succinctly addressed this issue, reaching the same conclusion as that in Bowman:

> The "purpose of a preliminary hearing is . . . to determine whether there exists probable cause to believe that a crime has been committed and that the accused committed the crime." State v. Lee, 693 S.W.2d 361, 363 (Tenn. Crim. App. 1985). The difference in the standard of proof not-withstanding, the basic purpose of the preliminary hearing and the trial are not "totally separate" as the Defendant argues, but rather deal with precisely the same issue: whether or not the accused is guilty of the crimes for which he or she is charged. See State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993) (holding that a preliminary hearing testimony of a declarant could be introduced at trial under the former testimony exception based primarily on a finding that "at both the [preliminary] hearing and the subsequent trial, the testimony was addressed to the same issue of '[w]hether or not the defendant[ ] had committed the offense' charged."). Accordingly, we conclude that the Defendant in this case had the opportunity to cross-examine Officer Beyer at the preliminary hearing with the same motives that would have guided his cross-examination of the declarant had he been available at trial. See State v. Brian Eric McGowen, No. M2004-00109-CCA-R3-CD, 2005 WL 2008183, at *11 (Tenn. Crim. App., Nashville, Aug. 18, 2005) (holding that the trial court did not err in allowing preliminary hearing testimony to be introduced at trial under the former testimony exception because the motive to cross-examine the defendant was the same at both the preliminary hearing and trial). Thus, Crawford's cross-examination requirement was met in this case.

Id. at *7; State v. Edward Warren Wise, No. M2012-02129-CCA-R3-CD, 2013 WL 4007787, at *5-6 (Tenn. Crim. App. Aug. 6, 2013).

Like the panels in Grubbs and Bowman, we also conclude that the Defendant's motive for cross-examining Hannah at the preliminary hearing was "similar" to the motive for cross-examining him at trial: to negate the Defendant's culpability for the offense charged. The preliminary hearing cross-examination was quite extensive, as he was cross-examined by three different attorneys because there were initially three defendants on trial for this murder. The questions examined the veracity of Hannah's statements, his criminal history, and his potential motivations for proffering his testimony. Further, during cross-examination, defense counsel got Hannah to admit that, contrary to the testimony on direct examination, Hannah never saw a weapon in the Defendant's hands and that Hannah had only assumed that the Defendant had a weapon because of the way he was holding his hands; Hannah also

admitted that he never heard the Defendant threaten the victim. At trial, Hannah refused to answer all but a few of the questions posed, citing fear of retribution, and informed the trial court that he would not testify under any circumstances; he maintained this position even after the trial court threatened to hold, and ultimately held, him in contempt of court. Therefore, it is for these reasons we conclude that Hannah's preliminary hearing testimony qualifies as "former testimony" and was admissible under Rule 804(b)(2). The record clearly shows that Hannah was "unavailable" at trial, that the Defendant had a similar motive to develop the testimony at the preliminary hearing as he would have had at trial, and that the preliminary hearing cross-examination was sufficient to meet the confrontation requirements of Crawford. See also Wise, 2013 WL 4007787, at *6 (reaching the same conclusion on similar facts). Thus, the Defendant is not entitled to relief on this issue.

*III. Consecutive Sentencing*

The Defendant contends that consecutive sentencing was improperly imposed because (1) none of the mandatory factors to consider when imposing consecutive sentencing applied in the Defendant's case, see Tenn. R. Crim. P. 32(c)(3); (2) the imposition of consecutive sentencing was not reasonably related to the seriousness of the offense; and (3) consecutive sentencing was not necessary to protect the public from the Defendant because his prior convictions were all for nonviolent offenses. The State responds that consecutive sentencing was properly imposed based upon the trial court's finding that the Defendant had an extensive criminal history, which was supported by the record. We agree with the State.

Our supreme court has recently held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations" "if [the trial court] has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." State v. James Allen Pollard, --- S.W.3d ---, No. M2011-00332-SC-R11-CD, 2013 WL 6732667, at *8-9 (Tenn. 2013). Further, "[s]o long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Id. at *9 (citing Tenn. R. Crim. P. 32(c)(1) ("The order [for consecutive sentences] shall specify the reasons for this decision and is reviewable on appeal."); see also State v. Bise, 380 S.W.3d 682, 705 (Tenn. 2012).

Tennessee Code Annotated section 40-35-115(b) provides that a trial court should consider the following criteria in determining whether to impose consecutive sentencing:

> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Id. The trial court may impose consecutive sentencing upon finding the existence of any one of the criteria contained in Tennessee Code Annotated section 40-35-115(b).

The trial court found sections 40-35-115(b)(1) and (2) applicable in the instant case, explaining as follows:

. . . I don't think there is any question that under 40-35-115 that, one is the defendant is a professional criminal that's mainly devoted . . . [his] life to criminal acts as a major source of livelihood. Sale of drugs is applicable to him. The offender is an offender whose record of the criminal activity is extensive and that's applicable to him.

The trial court then found that consecutive sentencing was warranted and ordered that the instant sentence be served consecutively to any unexpired sentences.

The record reflects that the Defendant has five prior felony cocaine convictions.

-12-

Although, as the Defendant repeatedly points out, these convictions are for nonviolent offenses, this fact is irrelevant to the trial court's consecutive sentencing decision because such was not imposed on the basis of the Defendant's being violent. Neither section 40-35-115(b) nor any other law restricts the imposition of consecutive sentencing solely to defendants who have committed violent offenses. Instead, it gives the trial court discretionary authority to impose consecutive sentencing whenever any one of the criteria apply; here, the trial court found two applicable. Therefore, we conclude that the trial court's finding that sub-parts (1) and (2) of section 40-35-115(b) applied to the Defendant was properly articulated, that there was no abuse of discretion, and that, for those reasons, its determination is presumed reasonable. The Defendant is not entitled to relief on this issue.

## CONCLUSION

Based on our review of the record and the applicable law, we affirm the judgment of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE

-13-